UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CALVIN JACKSON, SR., INDIVIDUALLY AND ON BEHALF OF C.J. | CIVIL ACTION NO. 22-0171 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| NORTH CADDO HOSPITAL SERVICE DISTRICT D/B/A NORTH CADDO MEDICAL CENTER | MAGISTRATE JUDGE HORNSBY |

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 22) filed by Plaintiff Calvin Jackson, Sr. ("Jackson"). Jackson maintains there is no genuine issue of material fact that Defendant North Caddo Hospital Service District d/b/a North Caddo Medical Center ("NCMC") failed to provide C.J. an appropriate medical screening under the Emergency Medical Treatment & Labor Act ("EMTALA"). See id. NCMC opposed the motion, arguing there are multiple specific facts proving that an appropriate medical screening examination required by EMTALA was done. See Record Document 28. Jackson replied. See Record Document 29. For the reasons set forth below, Jackson's Motion for Summary Judgment (Record Document 28) is **DENIED**.

### BACKGROUND[1]

This lawsuit arises under the EMTALA. Jackson alleges that NCMC violated Section 1395dd(a) of the EMTALA because it failed to provide C.J. an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition existed. See

---

[1]Much of the facts set forth in the instant Memorandum Ruling are drawn from the stipulated facts set forth in the parties' Pretrial Order. See Record Document 37 at 2-3.

Record Document 1 at ¶ 28. Jackson further alleges that NCMC violated Section 1395dd(b) of the EMTALA because it detected and had knowledge that C.J. was suffering from an emergency medical condition and failed to stabilize him before discharging him home. See id. at ¶ 29.

On Sunday, August 9, 2020, Jackson and his minor son, C.J., presented to the emergency room at NCMC, as C.J. had been experiencing nausea and vomiting. When they arrived at triage, Jackson informed the triage nurse that C.J.'s chief complaint was "dizziness, vomiting" and that he had been vomiting for four days and had vomited five to six times that day. Record Document 37 at 2. The triage nurse made note of this on C.J.'s chart. C.J. and Jackson then went to the waiting room for about 15 minutes until they were sent back to an examination room. On further questioning by Dr. John Chandler ("Dr. Chandler"), C.J. stated that "his main reason for presenting [was] a rash on his penis[;] [h]e state[d] that his appetite [was] normal and denied any [nausea or vomiting] to [Dr. Chandler]." Id. Dr. Chandler told C.J. that he wanted to examine the rash on his penis and asked C.J. to pull his pants down to show him the rash. Dr. Chandler diagnosed C.J. with a yeast infection and prescribed him a nystatin topical cream. Dr. Chandler also ordered an X-ray of C.J.'s chest and electrocardiogram-EKG and examined C.J.'s breathing. Dr. Chandler interpreted the chest X-Ray and EKG. It was noted on the EKG that the results were "probably normal for age." Id. Dr. Chandler reported in his notes, "Pt's father states that the patient is 'short of breath', pt never reported this," and that C.J. was "MR." Id. Dr. Chandler diagnosed C.J. with a yeast infection and discharged him around 8:23 p.m.

The next morning, Monday, August 10, 2020, Jackson's fiancé, Jessica Aguillar Jackson, found C.J. on the floor barely breathing. She called 911. Soon thereafter, the

Bossier Parish EMS arrived and, while in route to Willis Knighton - Bossier, C.J. went into cardiopulmonary arrest. The EMTs intubated C.J., he was given a dose of Epinephrine and Sodium Bicarbonate, and the EMTs performed chest compressions. The EMTs performed a glucose check, which showed C.J.'s blood sugar level was 460 mg/dl. At 11:40 a.m., Dr. Bryant Boyd examined C.J. and ordered blood work, which showed his blood sugar had increased to 1103 mg/dl and he had elevated potassium and creatinine levels. At 12:26 pm, C.J. was transferred to Willis Knighton - South via EMS. At 1:01 p.m. on August 10, 2020, C.J. was admitted to the Willis Knighton-South Pediatric Intensive Care Unit. Dr. Minh Tran ("Dr. Tran") planned to continue C.J. on mechanical ventilation with propofol, ordered fluid resuscitation and epinephrine infusion, and ordered insulin at 0.1 units per kg. Dr. Tran also informed Jackson that his son was in critical condition with a high rate of mortality. Ultimately, C.J. passed away on August 15, 2020 at approximately 6:40 p.m. C.J.'s death certificate listed the cause of death as diabetic ketoacidosis.

The NCMC Policies and Procedures for EMTALA Medical Screening Exam and Stabilization (MSE) are, in pertinent part, as follows:

> Scope: The Medical Screening Examination will be performed [by] the Emergency Department Physician and tailored to the presenting complaint and the medical history of any individual who comes to the Emergency Department seeking care. The MSE examination and/or treatment will not be delayed in order to inquire about the individual's insurance or payment status. All MSE's will include the following, but are not limited to:
>
>  1. Chief complaint and pertinent history
>  2. Past medical and social history
>  3. Physical examination
>  4. Assessment
>  5. Laboratory and imaging studies if appliable

Record Document 27-10 at 9. Jackson now moves for summary judgment on the issue of C.J.'s medical screening examination. He argues that Dr. Chandler did not follow

3

NCMC's policies and procedures under the EMTALA, thereby constituting an inadequate medical screening. See Record Document 22-1. Conversely, NCMC submits that multiple facts prove that a medical screening examination required by the EMTALA was done. See Record Document 28.

**LAW AND ANALYSIS**

**I.     Partial Summary Judgment Standard.[2]**

Rule 56(a) provides, in pertinent part:

> Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

F.R.C.P. 56(a) (emphasis added); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality Infusion Care, Inc., 628 F.3d at 728. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141

---

[2] Because the instant motion addresses only medical screening and not stabilization before discharge, the Court considers the instant motion to be a Motion for Partial Summary Judgment.

4

(5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

"A partial summary judgment order is not a final judgment but is merely a pre trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

## II.  The EMTALA.

Congress did not intend the EMTALA to be a federal malpractice statute. See Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998). Its purpose is to prevent "patient dumping," i.e., the practice of refusing to treat patients who are unable to pay. Id. The EMTALA "requires that participating hospitals give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening, (2) stabilization of a known emergency medical condition, and (3) restrictions on transfer of an unstabilized individual to another medical facility." Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000), citing 42 U.S.C. § 1395dd(a)-(c). More specifically, Section 1395dd(a) of the EMTALA provides:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an ***appropriate medical screening examination*** within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

5

42 U.S.C.A. § 1395dd(a) (emphasis added).  Thus, under the EMTALA, an appropriate medical screening examination is not judged by proficiency in diagnosis, but rather by whether it was performed equitably in comparison to other patients with similar symptoms.  See Marshall, 134 F.3d at 322.

The EMTALA does not define "appropriate medical screening examination."  Id. at 323.  An appropriate examination is one that the hospital would have provided "to any other patient in a similar condition with similar symptoms."  Id. The plaintiff has the burden of demonstrating that the hospital failed to provide an appropriate examination under the EMTALA.  See id. at 323–24.  The plaintiff may carry this burden by showing that either: (1) the hospital failed to follow its own standard screening procedures; or (2) there were "differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital"; or (3) the hospital offered "such a cursory screening that it amounted to no screening at all." Guzman v. Memorial Hermann Hosp. Sys., 409 Fed.Appx. 769, 773 (5th Cir. 2011).

"Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law."  Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 482 (S.D. Tex. 2009), aff'd, 409 F. App'x 769 (5th Cir. 2011).  Additionally, while a hospital violates Section 1395dd(a) when it does not follow its own standard procedures, "this . . . does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA."  Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522–23 (10th Cir. 1994).  "Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy."  Id.

6

The statute was not meant to "impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." Id.

### III. Analysis.

Here, Jackson argues that NCMC violated the EMTALA because it failed to follow its own standard screening procedures. As stated previously, the NCMC's EMTALA Medical Screening Exam and Stabilization Policy (MSE) provides:

> Scope: The Medical Screening Examination will be performed [by] the Emergency Department Physician and tailored to the presenting complaint and the medical history of any individual who comes to the Emergency Department seeking care. The MSE examination and/or treatment will not be delayed in order to inquire about the individual's insurance or payment status. All MSE's will include the following, but are not limited to:
>
>   1. Chief complaint and pertinent history
>   2. Past medical and social history
>   3. Physical examination
>   4. Assessment
>   5. Laboratory and imaging studies if appliable

Record Document 27-10 at 9. Jackson contends it is undisputed that Dr. Chandler did not obtain a past medical and/or social history and did not tailor the exam to C.J.'s chief presenting complaint. However, the Court's review of the summary judgment record reveals otherwise.

There are several key contested facts relating to C.J.'s medical screening. First, Jackson asserts that Dr. Chandler did not take and/or document C.J.'s social history, medical history, or surgical history. See Record Document 22-4 at 2 (NCMC Medical Records). This single page of the NCMC medical records state:

> **Past Medical/Family/Social History**
>    **Medical history:**
>       No active or resolved past medical history items have been selected or recorded.
>    **Surgical history:**
>       No active procedure history items have been selected or recorded.

7

<blockquote>
Id. Conversely, the NCMC points to the affidavit of Dr. Chandler, wherein he explained:
</blockquote>

> The triage nurse did an initial medical screening of the patient, which included vital signs and patient medical and social history, which I reviewed. This is documented at page 10 through 12 of the patient record.
>
> I personally performed a physical examination of C.J., as is documented in the record. I spoke with both C.J. and his father, and asked about the patient's medical and social history, and asked about his complaints. My notes on page 5 through 6, and again at 19 through 20 of the record show where I documented some of the information I got from talking with both patient and his father.

Record Document 28-2 at ¶¶ 4-5. The NCMC also submits that despite "an unrecorded box for medical and social history" on one page of the medical records, there is documentation throughout the entire medical chart indicating Dr. Chandler did take his own medical and social history, and confirmed the history noted by Nurse Rebecca Attaway at triage. Record Document 28 at 5.

Additionally, Jackson contends that Dr. Chandler focused on the rash on C.J.'s penis and did not tailor the medical screening examination to C.J.'s chief presenting complaint of nausea and vomiting or his medical history. However, the summary judgment records establishes that Dr. Chandler ordered a chest x-ray and pediatric ECG.[3] See Record Document 22-4 at 6-7. The results of the chest x-ray were normal and the pediatric ECG showed slight elevation that Dr. Chandler noted was "pro normal for age." Id. Dr. Chandler also performed a manual assessment of C.J.'s cardiac and breathing rhythm. See generally Record Document 22-4.

These factual issues create genuine disputes of material fact as to C.J.s' medical screening – did it comport with NCMC policy, was there any material deviation from the

---

[3] EKG and ECG are actually different spellings of the same diagnostic test that monitors the heart's electrical activity.

8

NCMC's standard screening policy, or was there simply a *de minimus* variation? This determination will be for the trier of fact at trial, not for this Court at the summary judgment stage.

## CONCLUSION

Based on the foregoing analysis, genuine disputes of material fact exist as to the appropriateness of C.J.'s medical screening under the EMTALA. Accordingly, Jackson's Motion for Summary Judgment (Record Document 22) must be **DENIED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 27th day of February, 2024.

_____
United States District Judge