# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| CALVIN JACKSON, SR., INDIVIDUALLY AND ON BEHALF OF C.J. | CIVIL ACTION NO. 22-0171 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| NORTH CADDO HOSPITAL SERVICE DISTRICT D/B/A NORTH CADDO MEDICAL CENTER | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Rule 56 Motion for Summary Judgment (Record Document 23) filed by Defendant North Caddo Hospital Service District d/b/a North Caddo Medical Center ("NCMC"). NCMC moves for summary judgment on Plaintiff Calvin Jackson, Sr.'s ("Jackson") claims under the Emergency Medical Treatment & Labor Act ("EMTALA"), arguing there is no genuine issue of material fact as to whether an EMTALA violation occurred in this case. See id. Jackson opposed the motion. See Record Document 27. For the reasons set forth below, NCMC's Motion for Summary Judgment (Record Document 23) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to Jackson's EMTALA claim based on failure to stabilize before discharge and **DENIED** as to Jackson's EMTALA claim based on an inadequate medical screening examination.

**BACKGROUND[1]**

This lawsuit arises under the EMTALA. Jackson alleges that NCMC violated Section 1395dd(a) of the EMTALA because it failed to provide C.J. an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition existed. See Record Document 1 at ¶ 28. Jackson further alleges that NCMC violated Section 1395dd(b) of the EMTALA because it detected and had knowledge that C.J. was suffering from an emergency medical condition and failed to stabilize him before discharging him home. See id. at ¶ 29.

On Sunday, August 9, 2020, Jackson and his minor son, C.J., presented to the emergency room at NCMC, as C.J. had been experiencing nausea and vomiting. When they arrived at triage, Jackson informed the triage nurse that C.J.'s chief complaint was "dizziness, vomiting" and that he had been vomiting for four days and had vomited five to six times that day. Record Document 37 at 2. The triage nurse made note of this on C.J.'s chart. C.J. and Jackson then went to the waiting room for about 15 minutes until they were sent back to an examination room. On further questioning by Dr. John Chandler ("Dr. Chandler"), C.J. stated that "his main reason for presenting [was] a rash on his penis[;] [h]e state[d] that his appetite [was] normal and denied any [nausea or vomiting] to [Dr. Chandler]." Id. Dr. Chandler told C.J. that he wanted to examine the rash on his penis and asked C.J. to pull his pants down to show him the rash. Dr. Chandler diagnosed C.J. with a yeast infection and prescribed him a nystatin topical

---

[1]Much of the facts set forth in the instant Memorandum Ruling are drawn from the stipulated facts set forth in the parties' Pretrial Order. See Record Document 37 at 2-3. Additionally, facts have been drawn from NCMS's Statement of Material Facts Not in Dispute and Jackson's Statement of Contested Fact. See Record Documents 23-3 and 27-3.

2

cream. Dr. Chandler also ordered an X-ray of C.J.'s chest and electrocardiogram-EKG and examined C.J.'s breathing. Dr. Chandler interpreted the chest X-Ray and EKG. It was noted on the EKG that the results were "probably normal for age." Id. Dr. Chandler reported in his notes, "Pt's father states that the patient is 'short of breath', pt never reported this," and that C.J. was "MR." Id. Dr. Chandler diagnosed C.J. with a yeast infection and prescribed Nystatin to treat C.J.'s genital rash and yeast infection. A second set of vitals signs were performed at 8:20 p.m. All were improved and stable within the normal limits for a healthy 13-year-old boy. Dr. Chandler discharged C.J around 8:23 p.m.

The next morning, Monday, August 10, 2020, Jackson's fiancé, Jessica Aguillar Jackson, found C.J. on the floor barely breathing. She called 911. Soon thereafter, the Bossier Parish EMS arrived and, while in route to Willis Knighton - Bossier, C.J. went into cardiopulmonary arrest. The EMTs intubated C.J., he was given a dose of Epinephrine and Sodium Bicarbonate, and the EMTs performed chest compressions. The EMTs performed a glucose check, which showed C.J.'s blood sugar level was 460 mg/dl. At 11:40 a.m., Dr. Bryant Boyd examined C.J. and ordered blood work, which showed his blood sugar had increased to 1103 mg/dl and he had elevated potassium and creatinine levels. At 12:26 pm, C.J. was transferred to Willis Knighton - South via EMS. At 1:01 p.m. on August 10, 2020, C.J. was admitted to the Willis Knighton-South Pediatric Intensive Care Unit. Dr. Minh Tran ("Dr. Tran") planned to continue C.J. on mechanical ventilation with propofol, ordered fluid resuscitation and epinephrine infusion, and ordered insulin at 0.1 units per kg. Dr. Tran also informed Jackson that his son was in critical condition with a high rate of mortality. Ultimately, C.J. passed away on August

15, 2020 at approximately 6:40 p.m.  C.J.'s death certificate listed the cause of death as diabetic ketoacidosis.

NCMC Policies and Procedures for EMTALA Medical Screening Exam and Stabilization (MSE) are, in pertinent part, as follows:

> Scope: The Medical Screening Examination will be performed [by] the Emergency Department Physician and tailored to the presenting complaint and the medical history of any individual who comes to the Emergency Department seeking care. The MSE examination and/or treatment will not be delayed in order to inquire about the individual's insurance or payment status. All MSE's will include the following, but are not limited to:
>
>   1. Chief complaint and pertinent history
>   2. Past medical and social history
>   3. Physical examination
>   4. Assessment
>   5. Laboratory and imaging studies if appliable
>
> …
>
> The medical screening exam is not an isolated event.  The record will reflect continued monitoring according to the patient's need and must continue until stabilized or appropriately transferred.

Record Document 23-9 at 1.  NCMC now moves for summary judgment as to all of the EMTALA claims, arguing Jackson cannot prove "patient dumping" either through a lack of an appropriate medical examination or through failure to stabilize.  See Record Document 23.

## LAW AND ANALYSIS

**I.     Summary Judgment Standard.**

Rule 56(a) provides, in pertinent part:

Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

4

F.R.C.P. 56(a) (emphasis added); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality Infusion Care, Inc., 628 F.3d at 728. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

## II. The EMTALA.

Congress did not intend the EMTALA to be a federal malpractice statute. See Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998). Its purpose is to prevent "patient dumping," i.e., the practice of refusing to treat patients who are unable to pay. Id. The EMTALA "requires that participating hospitals give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening, (2) stabilization of a known emergency medical condition, and (3) restrictions on transfer of an unstabilized individual to another medical facility." Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000), citing 42 U.S.C. § 1395dd(a)-(c).

5

> Section 1395dd(a) of the EMTALA provides:
>
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an ***appropriate medical screening examination*** within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

42 U.S.C.A. § 1395dd(a) (emphasis added). Thus, under the EMTALA, an appropriate medical screening examination is not judged by proficiency in diagnosis, but rather by whether it was performed equitably in comparison to other patients with similar symptoms. See Marshall, 134 F.3d at 322.

The EMTALA does not define "appropriate medical screening examination." Id. at 323. An appropriate examination is one that the hospital would have provided "to any other patient in a similar condition with similar symptoms." Id. The plaintiff has the burden of demonstrating that the hospital failed to provide an appropriate examination under the EMTALA. See id. at 323–24. The plaintiff may carry this burden by showing that either: (1) the hospital failed to follow its own standard screening procedures; or (2) there were "differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital"; or (3) the hospital offered "such a cursory screening that it amounted to no screening at all." Guzman v. Memorial Hermann Hosp. Sys., 409 Fed.Appx. 769, 773 (5th Cir. 2011).

"Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law." Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 482 (S.D. Tex. 2009), aff'd, 409 F. App'x 769

6

(5th Cir. 2011). Additionally, while a hospital violates Section 1395dd(a) when it does not follow its own standard procedures, "this . . . does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA." Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522–23 (10th Cir. 1994). "Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy." Id. The statute was not meant to "impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." Id.

> Section 1395dd(b)(1) of the EMTALA provides:
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>
> > (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> >
> > (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C.A. § 1395dd(b)(1). As used in the EMTALA, "the term 'stabilized' means, with respect to an emergency medical condition . . ., that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C.A. § 1395dd(e)(3)(B). "The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital." 42 U.S.C.A. § 1395dd(e)(4). The statute does not require the hospital to alleviate completely the emergency condition. See Brooker v. Desert Hosp. Corp., 947 F.2d 412, 415 (9th Cir. 1991). Rather, it requires the hospital to provide the appropriate medical screening and stabilizing treatment and to refrain from transferring before there is stabilization. See id. "The hospital's responsibility under the

7

statute ends when it has stabilized the individual's medical condition." Green v. Touro Infirmary, 992 F.2d 537, 539 (5th Cir. 1993), citing Brooker, 947 F.2d at 415.

"The duty to stabilize under the EMTALA does not arise unless the hospital has ***actual knowledge*** that the patient has an unstabilized medical emergency." Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000) (emphasis added). Hospitals are not held "accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996). If that were the case, then the EMTALA would "become coextensive with malpractice claims for negligent treatment." Id. "Analysis by hindsight is not sufficient to impose liability under EMTALA." Baber v. Hospital Corp. of America, 977 F.2d 872, 883 (4th Cir. 1992).

### III. Analysis.

Again, Jackson alleges that NCMC violated the EMTALA in two ways: it failed to provide C.J. an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition existed and it detected and had knowledge that C.J. was suffering from an emergency medical condition and failed to stabilize him before discharging him home. NCMC moved for summary judgment as to both allegations, arguing Jackson cannot prove "patient dumping" either through a lack of an appropriate medical examination or through failure to stabilize.

### A. Screening

The parties filed cross-motions for summary judgment on the issue of medical screening under the EMTALA. Jackson argued in his motion that NCMC violated the EMTALA because it failed to follow its own standard screening procedures. See Record

8

Document 22. Conversely, NCMC contends Jackson offered no evidence to prove a genuine issue of material fact as to the appropriateness of C.J.'s medical screening. See Record Document 23.

In a ruling issued as to Jackson's motion, this Court reasoned that there were several key contested facts relating to C.J.'s medical screening, namely relating to whether Dr. Chandler obtained a social history, medical history, and surgical history and whether C.J.'s exam was tailored to the chief presenting complaint. See Record Document 45 at 7-8. The Court held:

> These factual issues create genuine disputes of material fact as to C.J.s' medical screening – did it comport with NCMC policy, was there any material deviation from the NCMC's standard screening policy, or was there simply a *de minimus* variation? This determination will be for the trier of fact at trial, not for this Court at the summary judgment stage.

Id. at 8-9. The same rationale prevents this Court from granting NCMC's motion as to C.J.'s medical screening. Summary judgment on this issue must be **DENIED**.

### B. Stabilization and Discharge[2]

NCMC has moved for summary judgment on the ground that Jackson cannot show a genuine dispute of material fact as to "patient dumping" based on failure to stabilize before discharge. Jackson does not dispute that Dr. Chandler documented at 8:09 p.m. that the patient's condition at discharge was "Stable." Record Document 23-4 at 21, 23; Record Document 23-8 at 3-4. Based on the medical records, Dr. Chandler and the medical staff at NCMC perceived C.J. to be stable for discharge. C.J. did not show any signs of being unstable, and all of vitals had improved and were within normal range at the 8:20 p.m. assessment. See Record Document 23-4 at 26, 29; Record

---

[2] The Court notes that Jackson's opposition (Record Document 27) appears to focus on adequate medical screening examination and does not address stabilization and discharge.

9

Document 23-8 at 3; Record Document 23-10 at 2.  The EMTALA does not require Dr. Chandler to stabilize conditions not diagnosed.  Jackson has come forward with no competent summary judgment evidence to show that at the time of discharge, Dr. Chandler had actual knowledge that C.J. was still suffering from an emergency medical condition.  See Battle, 228 F.3d at 558 ("The duty to stabilize under the EMTALA does not arise unless the hospital has ***actual knowledge*** that the patient has an unstabilized medical emergency."); Vickers, 78 F.3d at 145 (Hospitals are not held "accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware.").  Additionally, NCMC has pointed the Court to the expert testimony of Dr. Jullette M. Saussy, Plaintiff's expert.  She testified in her deposition that she does not believe Dr. Chandler had actual knowledge of an emergency medical condition:

> Q: "You're assuming that Dr. Chandler had, quote, actual knowledge of an emergency medical condition?
>
> A: "Well, obviously he did not, because he let the child go home with some nystatin.
>
> Q: With what?
>
> A: With the drug for a rash.
>
> Q: Okay. The nystatin.
>
> A: So, I mean, I think that, - - I don't think he would have sent a child home with DKA [diabetic ketoacidosis]."

Record Document 23-6 at 89.  There is simply no evidence of NCMC having actual knowledge of an emergency medical condition, that is diabetic ketoacidosis, at the time of discharge. Summary judgment is therefore **GRANTED** because there is no genuine dispute of material fact for trial as to whether NCMC complied with its stabilization before discharge duties under the EMTALA.

## CONCLUSION

Based on the foregoing analysis, genuine disputes of material fact exist as to the appropriateness of C.J.'s medical screening under the EMTALA. Accordingly, NCMC's motion must be **DENIED** on this ground. On the contrary, NCMC's motion is **GRANTED** as to Jackson's claim of an EMTALA violation based on actual knowledge that C.J. was suffering from an emergency medical condition and failure to stabilize him before discharge.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 29th day of February, 2024.

_____
United States District Judge