UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CALVIN JACKSON, SR., INDIVIDUALLY AND ON BEHALF OF C.J.

CIVIL ACTION NO. 22-0171

VERSUS

JUDGE S. MAURICE HICKS, JR.

NORTH CADDO HOSPITAL SERVICE DISTRICT D/B/A NORTH CADDO MEDICAL CENTER

MAGISTRATE JUDGE HORNSBY

**MEMORANDUM OPINION**

This matter came on for bench trial on March 25, 2024. See Record Document 56. Expert depositions were submitted and Plaintiff Calvin Jackson, Sr. ("Jackson"), individually and on behalf of C.J., filed a Post-Trial Memorandum on Damages. See Record Documents 56 & 61. This litigation presents a claim under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd; thus, this Court has subject matter jurisdiction over this case and the claims asserted herein pursuant to 28 U.S.C. § 1331. Based on the factual findings and legal conclusions set forth below, the Court finds there was no violation of the EMTALA and renders judgment in favor of Defendant North Caddo Hospital Service District d/b/a North Caddo Medical Center ("NCMC").[1]

---

[1] Also before the Court is a Motion in Limine (Record Document 35) filed by NCMC. Jackson did not contest two of the three grounds set forth in the defense motion. Thus, during the final pretrial conference, the Court granted the motion as to those two grounds: (1) a $500,000 cap on any potential damages pursuant to La. R.S. 13:5106(B) because of NCMC's status as a political subdivision of the State of Louisiana; and (2) preventing Jackson from introducing any evidence at trial that seeks to establish any lost chance of survival damages because such damages are permitted only in medical malpractice actions under Louisiana law. See Record Document 50 at 2.

The remainder of the Motion in Limine addressed the defense position that there is a $100,000 cap on any possible damages pursuant to the Louisiana Medical

FINDINGS OF FACT

On Sunday, August 9, 2020, at 5:29 pm, Jackson and his 13 year-old son, C.J., presented to the emergency room ("ER") at NCMC because C.J. had been experiencing nausea and vomiting for approximately four days.  Prior to arriving at NCMC, Jackson testified that C.J. had vomited, was unable to keep any food or water down, was dizzy, and was short of breath.  On the Emergency Room Patient Information form, Jackson stated that the reason for the C.J.'s visit was "dizziness, vomiting."  Exhibit A at JACKSON005.  In triage, Jackson informed Registered Nurse Rebecca Attaway ("Nurse Attaway") that C.J. had been vomiting for three to four days and had vomited five to six times that day.  See id. at JACKSON011 (ED Triage Pediatrics).  Jackson testified that he told Nurse Attaway that C.J. felt nauseous, was weak, and could not hold anything down.  Nurse Attaway's triage assessment reflects that she took C.J.'s temperature, systolic blood pressure, diastolic blood pressure, peripheral pulse rate, respiratory rate, and oxygen level.  See id.  According to Nurse Attaway, C.J.'s respiratory rate and oxygen levels were normal.  The triage assessment/emergency documentation also reflects C.J.'s height, weight, and BMI.  See id.  Nurse Attaway stated that this was all part of her medical screening examination.  Nurse Attaway scored C.J. a tracking acuity of 5, indicating he was not critical.  See id.  Nurse Attaway also testified regarding C.J.'s medical social history, stating that there were no signs or symptoms of abuse and neglect

---

Malpractice Act, ("LMMA"), specifically La. R.S. 40:1231.2(B)(2).  See Record Document 35 at 5-9.  Jackson opposed the motion on this ground.  See Record Document 39.  Resolution of this issue was deferred to trial.  See Record Document 50 at 2.  Because this Court has found no violation of the EMTALA and rendered judgment in favor of NCMC, there is no need to reach the contested issue of whether the LMMA's $100,000 damages cap applies in this instance.  NCMC's Motion in Limine (Record Document 35) is terminated as **MOOT**.

and C.J. had never smoked, used electronic cigarettes, or vaped.  See id. at JACKSON013.  She further testified that C.J. was alert, his behavior was appropriate, and he was calm and cooperative.

C.J. was then moved to an examination room and seen by Dr. John Chandler ("Dr. Chandler"), a family practice physician who worked in the emergency room at NCMC.  See id. at JACKSON006.  Dr. Chandler testified that he had been practicing as an emergency medicine physician since 2016 and was tendered as an expert physician in emergency medicine.  Dr. Chandler explained that as the ER physician, he took his own medical history and did his own medical screening of C.J, including cardiovascular, respiratory, and psychiatric.  See id.  Additionally, he reviewed the triage information for C.J. and noted two things:  his heart rate was up a little bit and his diastolic blood pressure was up.  Dr. Chandler testified this could be indicative of hypertension or from C.J. being in the emergency room, which can be an anxiety provoking situation.

Dr. Chandler recalled at trial that he considered C.J.'s chief complaints to be nausea, vomiting, and a rash on his penis.  In his ED Note, Dr. Chandler wrote:

> **History of Present Illness**
> The patient presents with rash.  The onset was about a week.  The course/duration of symptoms is constant. Location:  foreskin of penis.  The character of symptoms is itching. . . . Additional history: Pt is a 13 year old AA male with MR who presents to ED and initially reports that he was nauseated, but on further questioning his main reason for presenting is a rash on his penis.  He states that his appetite is normal and denied any N/V to me.

Id.[2]  Dr. Chandler testified that he got this medical history from C.J.  Dr. Chandler recalled that Jackson relayed C.J. had been short of breath, but C.J. did not report this.  See id.

---

[2] At trial, Dr. Chandler clarified that "MR" referred to mentally retarded.  He testified that C.J. did not tell him he was mentally retarded, but Jackson implied it.  When asked how Jackson implied it, Dr. Chandler explained that Jackson told him C.J. was not right.  Dr. Chandler interpreted this to mean C.J. was a child with special needs.  The defense

3

Notwithstanding, Dr. Chandler listened with his stethoscope and found C.J.'s heart to have a regular rate and rhythm. See id. at JACKSON007. Additionally, C.J.'s lungs were clear, respiration was non-labored, and breath sounds were equal. See id. Dr. Chandler further testified that he ordered a chest X-ray due to the shortness of breath and an EKG because of the elevated heart rate. As to C.J.'s skin examination, Dr. Chandler found "skin of the distal penile foreskin is slightly swollen with white exudative material around the glans." Id. Dr. Chandler also explained that C.J.'s social history was tailored to the 13 year-old patient, specifically noting there was no history of smoking, use of electronic cigarettes, or vaping.

The results of the chest X-ray were "normal." See id. at JACKSON031. The EKG was read as "prob[ably] normal for age." Id. at JACKSON022. Dr. Chandler testified that C.J.'s vital signs at 8:20 p.m. had all improved. See id. at JACKSON026. Dr. Chandler diagnosed C.J. with a yeast infection and prescribed nystatin topical cream. C.J. was discharged at 8:23 pm. After C.J. was discharged, he returned home with Jackson and went to sleep.

The next morning, Monday, August 10, 2020, Jackson's fiancé, Jessica Jackson, found C.J. on the floor barely breathing. She testified that she called 911. Bossier Parish Emergency Medical Service ("EMS") arrived and, while in route to Willis Knighton – Bossier, C.J. went into cardiopulmonary arrest. See Exhibit B at JACKSON007. The Emergency Medical Technicians ("EMTs") intubated C.J., he was given a dose of

---

expert, Jacquelyn White, MD, also testified at trial that Dr. Chandler's belief may have been based, in part, on C.J.'s speech impediment.

Dr. Chandler admitted during his trial testimony that he must have been mistaken about C.J.'s perceived mental deficiencies in light of the trial testimony of C.J.'s seventh grade English teacher, Leslie Ilgenfritz ("Ilgenfritz"). Dr. Chandler stated that, given the testimony of Ilgenfritz, Jackson was likely implying that something was acutely "not right" during the time frame Jackson brought C.J. to the ER.

4

Epinephrine and Sodium Bicarbonate, and the EMTs performed chest compressions. See id. at JACKSON007-009.  The EMTs performed a glucose check, which showed C.J.'s blood sugar level was 460 mg/dl.  See id.  C.J. was without a pulse when he arrived at Willis Knighton – Bossier.  See id.  He regained rhythm after additional CPR.  See id. at JACKSON008.  Dr. Bryant Boyd examined C.J. and ordered blood work, which showed his blood sugar had increased to 1103 mg/dl and he had elevated potassium and creatinine levels.  See id. at JACKSON 009-011.

C.J. was transferred via EMS and admitted to Willis Knighton – South Pediatric Intensive Care Unit.  See Exhibit C.  Upon examination, Dr. Minh Tran found that C.J. was unresponsive, tachycardic, and in diabetic ketoacidosis ("DKA") with hypovolemic shock versus cardiogenic shock versus septic shock.  See id.  Despite medical treatment, the providers were unable to control C.J.'s blood sugar or otherwise reverse his DKA.  See id.  C.J. passed away on August 15, 2020, and his death certificate listed the cause of death as DKA.  See id.; see also Exhibit E.

## CONCLUSIONS OF LAW

Congress did not intend the EMTALA to be a federal malpractice statute.  See Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998).  Its purpose is to prevent "patient dumping," i.e., the practice of refusing to treat patients who are unable to pay.  Id.[3]  The EMTALA "requires that participating hospitals give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening, (2) stabilization of a known emergency medical condition, and (3) restrictions on transfer of an unstabilized individual to another medical facility." Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000), citing

---

[3] There is no allegation of patient dumping in this case.

5

42 U.S.C. § 1395dd(a)-(c).  Jackson submits that there was a violation of the EMTALA in this case because (1) neither Nurse Attaway nor Dr. Chandler asked about C.J.'s medical or social history as part of the medical screening examination; and (2) the medical screening examination was cursory and not tailored to C.J.'s chief presenting complaint.  Thus, the first requirement – an appropriate medical screening – is the key issue in this case.[4]

> Section 1395dd(a) of the EMTALA provides:
>
> In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an ***appropriate medical screening examination*** within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

42 U.S.C.A. § 1395dd(a) (emphasis added).  Thus, under the EMTALA, an appropriate medical screening examination is not judged by proficiency in diagnosis, but rather by whether it was performed equitably in comparison to other patients with similar symptoms.  See Marshall, 134 F.3d at 322.  The statute does not specifically define "appropriate medical screening examination."  Id. at 323.  An appropriate examination is one that the hospital would have provided "to any other patient in a similar condition with similar symptoms."  Id. The plaintiff has the burden of demonstrating that the hospital failed to provide an appropriate examination under the EMTALA.  See id. at 323–24. The plaintiff may carry this burden by showing that either: (1) the hospital failed to follow its own standard screening procedures; (2) there were "differences between the screening examination that the patient received and examinations that other patients

---

[4] Jackson has not alleged failure to stabilize a *known* emergency medical condition or any restriction on the transfer of C.J. to another medical facility.

6

with similar symptoms received at the same hospital"; or (3) the hospital offered "such a cursory screening that it amounted to no screening at all." Guzman v. Mem'l Hermann Hosp. Sys., 409 Fed.Appx. 769, 773 (5th Cir. 2011). Jackson submits that he has met his burden under two of the aforementioned options, that is, NCMC failed to follow its own EMTALA policy and C.J.'s screening was cursory.

"Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law." Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 482 (S.D. Tex. 2009), aff'd, 409 F. App'x 769 (5th Cir. 2011). Additionally, while a hospital violates Section 1395dd(a) when it does not follow its own standard procedures, "this . . . does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA." Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522–23 (10th Cir. 1994). "Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy." Id. The statute was not meant to "impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." Id.

The Court will now consider Jackson's contentions that the medical screening in this case did not include C.J.'s medical or social history, was cursory, and/or was not tailored to C.J.'s chief presenting complaint(s). The starting point is NCMC's EMTALA Medical Screening Exam and Stabilization Policy (MSE), which provides:

> Scope: The Medical Screening Examination will be performed [by] the Emergency Department Physician and tailored to the presenting complaint and the medical history of any individual who comes to the Emergency Department seeking care. The MSE examination and/or treatment will not be delayed in order to inquire about the individual's insurance or payment status. All MSE's will include the following, but are not limited to:
>
>     1. Chief complaint and pertinent history

7

    2. Past medical and social history
    3. Physical examination
    4. Assessment
    5. Laboratory and imaging studies if appliable

Exhibit D at 7.[5] NCMC's policies and procedures further state that "a medical screening will be performed on all patients that present to the emergency department for care and treatment by the physician on duty." Id. at 4.

**C.J.'s Past Medical and Social History**

Jackson asserts neither Nurse Attaway nor Dr. Chandler asked about C.J.'s past medical history or social history. More specifically, Jackson points to the complete lack of questions relating to C.J.'s family medical history. Jackson contends that if questions had been asked about C.J.'s family medical history, then Nurse Attaway and Dr. Chandler would have learned that C.J.'s mother died in 2017 from complications of diabetes, indicating a family history of diabetes.

As set forth above, past medical and social history is a requirement of NCMC's MSE policy. Conversely, the Court notes there is no reference to family history in the NCMC's MSE policy. Nurse Attaway testified at trial that there is a difference between a family history and a social history. Dr. Chandler admitted he did not he did take a family history, but testified he did get C.J.'s medical and social history.

The parties have submitted expert depositions in support of their positions. Dr. Juliette Saussy ("Dr. Saussy") gave deposition testimony on behalf of Jackson, and Dr. Jacquelyn White ("Dr. White") gave expert testimony on behalf of NCMC.[6] Both experts

---

[5] NCMC's EMTALA Medical Screening Exam and Stabilization Policy will be shortened to NCMC's "MSE policy."

[6] Dr. Saussy is a board certified emergency medicine physician with privileges at Baton Rouge General in Baton Rouge, Louisiana and Covington Trace ER & Hospital in Mandeville, Louisiana. By stipulation, she was tendered as an expert in emergency medicine. Dr. White is also a board certified emergency medicine physician. She is the

8

testified that C.J.'s medical records indicate at least some social history was taken. The medical records reflect inquiries from Nurse Attaway and/or Dr. Chandler and responses indicating no domestic concerns; no signs or symptoms of abuse or neglect; that C.J. had no history of tobacco use (cigarettes), use of electronic cigarettes, or vaping; there was no need to call an interpreter; no ED homicide ideations; and C.J. was not feeling down, depressed, irritable, or hopeless. See Exhibit A at JACKSON012-JACKSON013. Dr. Saussy testified there was no adequate social history, and she believed Dr. Chandler simply reviewed the triage notes and did not ask or explore C.J.'s social history. Conversely, Dr. White testified that there was an appropriate social history taken, which was tailored to the pediatric patient.

As to medical history, Dr. Chandler explained that he got a medical history, noting his ED Note discussing "history of present illness" and "additional history." Id. at JACKSON006. Dr. Chandler further testified that Jackson had reported C.J. having shortness of breath, which Dr. Chandler considered to be part of C.J.'s medical history because C.J. did not make such a report to Dr. Chandler. The medical records also reflect the date of C.J.'s last tetanus shot, that his immunizations were current, and he had no known allergies. See id. at JACKSON006, JACKSON012. Dr. Chandler's entries indicate no active or resolved past medical history and no active surgical procedure history. See id. at JACKSON006.

Dr. Saussy opined that there was no adequate past medical history documented in the medical records. Other than entries reflecting no known allergies/medications, and the MR notation, she saw no past medical history in the medical records. She

---

Medical Director of Health Hut and does contract work with LaSalle Corrections. Without objection, she was tendered as an expert in emergency medicine.

believes Dr. Chandler neither asked nor explored C.J.'s medical history. Conversely, Dr. White testified she believed there was an appropriate medical history tailored to the pediatric patient. She stated that date of last tetanus shot, immunizations being current, and no known allergies are all considered to be part of C.J.'s medical history. The past medical history was documented in the medical chart, and Dr. White explained Dr. Chandler is ultimately responsible for the nursing documentation in the chart as well. According to Dr. White, other than medications and allergies, there was simply no real past medical history for C.J.

After considering all of the evidence, this Court finds that the medical screening examination of C.J. included an appropriate past medical and social history. The medical records reflect that Nurse Attaway obtained medical and social history. Moreover, in addition to what he had learned from the triage nurse, Dr. Chandler talked to both C.J. and Jackson. His ED Notes demonstrate information about C.J.'s medical and social history. The testimony of both experts likewise supports the conclusion that some level of a past medical and social history was taken. NCMC's MSE policy required past medical and social history. See Exhibit D at 7. It did not specifically reference family history. See id. Nurse Attaway testified that there was a difference between a family history and a social history. Jackson has not provided any evidence that a family history was required under NCMC's MSE policy. Moreover, even if this Court were to hold that the failure to ask about C.J.'s mother was a deviation from NCMC's MSE policy or was negligence, it would be insufficient to prove a violation of the EMTALA. While the circumstances surrounding the past family history and C.J.'s death in this case are tragic, the Court does not believe that any deviation in relation to past medical or social history was a material deviation. *De minimus* variations from a hospital's standard procedures

or negligence in the screening process do not, by themselves, constitute an EMTALA violation.  See Guzman, 637 F. Supp. 2d at 481; Repp, 43 F.3d at 523.

**Medical Screening – Was it Cursory?  Was it Tailored to C.J.'s Chief Presenting Complaint(s)?**

Additionally, Jackson contends that C.J.'s medical screening was cursory and not tailored to C.J.'s chief presenting complaints of nausea and vomiting.  While the past medical and social history provision was discussed above, NCMC's MSE policy further states that the medical screening exam will include the chief complaint and pertinent history, physical examination, assessment, and laboratory and imaging studies if applicable.  See Exhibit D at 7.

As stated *supra*, one of the ways Jackson may carry his burden of showing that NCMC failed to provide an appropriate medical screening is that the hospital offered "such a cursory screening that it amounted to no screening at all."  Guzman, 409 Fed.Appx. at 773.  Jackson has offered no proof that NCMC, Nurse Attaway, or Dr. Chandler treated C.J. differently from any other pediatric patients.  Nurse Attaway performed an ED triage pediatrics assessment, which included taking C.J.'s vital signs.  She assigned C.J. a tracking acuity of 5.[7]  Dr. Chandler testified that the medical screening in this case was "pretty involved" for the ER.  He explained that C.J.'s screening was more in depth than a patient who presented only with a rash.  C.J. was in the ER for almost three hours.  Dr. Chandler physically examined C.J., including listening to C.J.'s breathing and heart rate/rhythm with a stethoscope.  Dr. Chandler also ordered a chest X-ray and an EKG, which required transport to an X-ray room and the

---

[7] Again, a tracking acuity of 5 means C.J.'s vital signs and other presentations indicated he was not critical.  Dr. White testified that a DKA patient would have pretty severely abnormal vital signs.

involvement of respiratory and radiology technicians. These facts simply do not support a finding that C.J.'s screening was so cursory that it amounted to no screening at all.

Next, Jackson argues that C.J.'s medical screening was not tailored to the chief presenting complaints of nausea and vomiting. The Emergency Room Patient Information form listed "dizziness, vomiting" as the reason for C.J. visit to the ER. See Exhibit A at JACKSON005. Jackson also told Nurse Attaway in triage that C.J. was nauseous, weak, and could not hold anything down. The triage note provided: "Chief Complaint pt reports that he has been vomiting x3-4 days and has vomited 5-6x today." Id. at JACKSON006. In Dr. Chandler's ED Note, he stated that C.J. presented with a rash on the foreskin of his penis. See id. As additional history, Dr. Chandler entered the following:

> Pt is a 13 year old AA male with MR who presents to ED and initially reports that he was nauseated, but on further questioning his main reason for presenting is a rash on his penis. He states that his appetite is normal and denied any N/V to me.

Id. Dr. Chandler further averred that Jackson related C.J. had been short of breath, but C.J. did not report this to him. See id. During his testimony, Dr. Chandler acknowledged that there was some confusion regarding the primary reason for C.J.'s ER visit – nausea, vomiting, and/or the rash. Yet, the record contains testimony from both Dr. Chandler and Dr. White – two witness this Court finds to be credible – that it is possible for patients to have more than one chief complaint. In fact, it was Dr. White's opinion that C.J.'s chief complaint to the triage nurse was the nausea and vomiting and his chief complaint to Dr. Chander was the rash.

Dr. White testified that in her opinion, the medical screening examination in this case did not violate the EMTALA. Her testimony was based – among other things – on her review of the medical records. She noted that Nurse Attaway asked C.J. questions

in triage that were tailored to his age (pediatrics) and the chief complaint of vomiting. Dr. Saussy stated that she believed Dr. Chandler focused only on the rash and discounted the triage note regarding nausea and vomiting and the reports of shortness of breath. Yet, Dr. Chandler specifically referenced the nausea and vomiting in his additional history.[8] Thus, while Dr. White does not dispute that Dr. Chandler focused more on the rash, she testified that this was likely because his examination was tailored more to the chief complaint given to him by C.J., not the triage note(s). Additionally, the medical records demonstrate that Dr. Chandler also focused on the complaints regarding shortness of breath, as the EKG and chest X-ray performed in this matter were tailored to that complaint.[9] Likewise, the social history screening questions regarding the use of tobacco, electronic cigarettes, and/or vaping were also tailored to a pediatric patient with shortness of breath.

In sum, this Court finds that the facts of this case fall short of establishing a violation of the EMTALA. The statute is not a federal malpractice statute. See Marshall, 134 F.3d at 322. An appropriate medical screening examination is not judged by proficiency in diagnosis or a physician's misdiagnosis. Even if those facts could constitute negligence or medical malpractice, a lack of proficiency and a missed diagnosis do not necessarily create an EMTALA claim. See id.; see also Guzman, 637

---

[8] Dr. Chandler's notes reflect "no abdominal pain, no nausea, no vomiting." Exhibit A at JACKSON006. Dr. White explained this meant C.J. was *currently* not having any abdominal pain, nausea, or vomiting. C.J. had reported the vomiting in triage, but not to Dr. Chandler.

[9] Dr. Chandler testified that if he had suspected diabetes, he would have ordered bloodwork/lab work. Likewise, Dr. White stated in all likelihood if Dr. Chandler had suspected DKA, he would have checked C.J.'s blood sugar by doing an Accu-Chek pinprick on his finger. She noted that such a test is much easier to do and takes less resources than either an EKG or an X-ray.

F. Supp. 2d at 482.  Dr. Chandler's actions may have risen to level of state medical malpractice, but they did not violate the EMTALA.  With the benefit of hindsight, it is apparent that all NCMC medical professionals involved in this case would have liked another chance and a different outcome with respect to C.J.'s ER visit.  Dr. Chandler testified that he wished he had done more of a screening and expressed that he actually settled a medical malpractice complaint related to the facts of this case, partially because he did not like the outcome.  Dr. Saussy was also critical of the medical screening in this matter because there was what she called a material deterioration of the patient after discharge.  She expressed that she believed there should have been more questions asked; a full workup to evaluate for dehydration; and bloodwork to consider an underlying infection and kidney function.  She added that she would have performed a urinalysis and taken the glucose level of a 13 year-old boy with a significant candidal (yeast) rash.  She believes there should have been a much wider differential than just a rash on C.J.'s penis.  But her treatment deficiencies and Jackson's arguments are a critique of Dr. Chandler's missed diagnosis of diabetes.  There may well have been negligence in the screening process and there was certainly a missed diagnosis, but there was not a refusal to screen, a cursory screening, or any evidence of a disparate screening.  There may have been a violation of state malpractice law, but there was no violation of the EMTALA.  See Guzman, 637 F. Supp. 2d at 482.

## CONCLUSION

Based on the factual findings and legal conclusions set forth above, the Court holds that Nurse Attaway and Dr. Chandler performed an appropriate medical screening of C.J. under the EMTALA.  There was sufficient medical and social history taken, the medical screening examination was not cursory, and the medical screening examination

was tailored to C.J.'s chief presenting complaints.  While the missed diabetes diagnosis is tragic, there was no violation of the EMTALA.  Judgment in favor of NCMC is hereby rendered.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 23rd day of July, 2025.

_____
United States District Judge